UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

TIMMY HUNT,

Defendant.

Case No. 20-CR-10119-DJC

## OPPOSITION TO MOTION TO SUPPRESS

In his Motion to Suppress (Dkt. No. 84) ("Motion"), Defendant Timmy Hunt seeks to suppress the three hours' worth of GPS data that agents with the Federal Bureau of Investigation ("FBI") obtained from an electronic monitoring device that Hunt had asked to wear in lieu of being held in custody pre-trial in a criminal case in Suffolk Superior Court.  This motion should be denied because, to the extent the attachment of the GPS bracelet constituted a search, it was a reasonable search under the Fourth Amendment and one that Hunt consented to.  Moreover, FBI agents' obtaining this limited data from a third party custodian does not constitute a search for constitutional purposes, and even if it does, it was the essence of reasonable: precise and limited in scope, directly related to the purpose for which GPS monitoring had been imposed and agreed to, and only providing information about Hunt's presence on public roadways, which cannot be deemed private.  Additionally, at the time FBI agents obtained the GPS data, they already had probable cause that Timmy Hunt was at the location of the controlled purchases and probable cause that the GPS data would provide further evidence of his involvement.  Finally, even if there were any Fourth Amendment violation, suppression is not appropriate, given agents' reasonable conduct and the absence of any federal law requiring a search warrant in order to obtain such data.

# BACKGROUND[1]

### A.  February 26, 2020 Sale of 13.053 Grams of Crack Cocaine for $800

Since approximately February of 2020, a Cooperating Witness ("CW") was working with the Federal Bureau of Investigation ("FBI") on an investigation regarding narcotics distribution by Trevel Brewster and Timmy Hunt in the Boston area.  Affidavit of Timothy R. Kenny dated July 1, 2020, 20-MJ-1119-DLC ("Kenny Aff.") ¶ 9.

On February 25-26, 2020, the CW and Trevel Brewster arranged for the CW to purchase 14 grams of crack cocaine from Brewster for $800.  *Id.* ¶¶  18-19.  According to call records received by FBI on or around March 6, on February 26 at approximately 2:34pm, Brewster's 857-492-7878 phone number ("Brewster's -7878 Number") received a call from Hunt's 617-690-9326 phone number ("Hunt's -9326 Number").  *Id.* ¶ 19.  Three minutes later, at 2:37pm, Brewster called the CW from Brewster's -7878 Number and instructed the CW to meet him near the Dunkin' Donuts near the Ashmont train station.  *Id.*  Around 3pm, the CW traveled to that location.  *Id.* ¶ 20.  At approximately 3:14pm, Brewster entered the front passenger seat of the CW's car and directed the CW to the area of 82 Talbot Avenue, Boston, Massachusetts.  *Id.* ¶¶ 20-21.  Brewster and the CW talked while waiting in the car.  At one point Brewster received a call and described to the caller who he could see in the area and that the area was "dead."  After

---

[1] Facts in this section are taken from a prior affidavit submitted by Special Agent Timothy R. Kenny; an affidavit of Special Agent Timothy R. Kenny dated June 11, 2021, filed herewith; and various documents and files produced during discovery, which are cited by bates number but not attached to this briefing.  The government does not believe that any of these facts are disputed for purposes of this Motion.  If the defendant indicates that they are, or if the Court wishes to review any of the cited materials, the government is prepared to submit copies of these materials to the Court for its review.

hanging up, he said to Brewster, "That's another thing I hate.  Motherfuckers be all scared and shit.  Like you know what you got yourself into when you started gang banging and all that shit. Don't be scared now."  USAO 0060 at 27:00-28:05.

Around 3:47pm, Brewster received an incoming call from the Hunt -9326 Number.[2] Kenny Aff. ¶ 21.  A video recording taken inside the CW's car shows that at the time of this call, a white sedan turns into the parking lot of 82 Talbot Avenue and stops in the parking lot with its brake lights illuminated.  Brewster, while talking on his cell phone, appears to look in the direction of the white sedan and asks, "You got your little brake lights on right now?"  After getting off the phone, Brewster tells the CW he's about to re-up too, and wants to make sure "he gets his shit."  USAO 0060 at 48:10-48:32.  The CW hands Brewster $800.  The video shows that Brewster exits the CW's vehicle, walks to the white sedan, and enters the rear driver's side of the white sedan.  The white sedan then drives further into the parking lot.  *Id.*  Several minutes later, Brewster returns to the CW's vehicle, enters the front passenger seat, and hands the CW a plastic bag containing a substance that later tested positive for crack cocaine.  *Id.* ¶ 22; USAO 0069 (certificate of analysis).

### B.  March 2, 2020 Sale of 27.305 Grams of Crack Cocaine for $1500

On March 2, 2020, the CW and Brewster arranged for the CW to purchase 28 grams of crack cocaine for $1500 at 4pm.  Kenny Aff. ¶ 27.  According to the Sprint call detail records for the Brewster -7878 Number, on March 2, Brewster received a call from Hunt's -9326 Number at

---

[2] Toll records indicate that there were 4 text messages and 3 calls between Hunt and Brewster between 3pm and 4pm on February 26.  Of particular note, toll records indicate Hunt's phone called Brewster's phone at 3:26 and 3:47.  *See* USAO 1544-45; USAO 0310-312.

approximately 4:00 p.m.  At approximately 4:01 p.m., Brewster called the CW.  During that call, Brewster instructed the CW to meet him at Ashmont in twenty minutes.  Immediately following the call to the CW, BREWSTER called Hunt's -9326 Number.  Kenny Aff. ¶ 28.

At approximately 4:31 p.m., under the surveillance of law enforcement, CW traveled to the area of Dunkin' Donuts at 1931 Dorchester Avenue and parked in the Dunkin' Donuts parking lot.  At approximately 4:41 p.m., Brewster entered the front passenger seat of CW-1's vehicle.  Kenny Aff. ¶ 30.  Brewster told the CW he was waiting for "his man." USAO 0092 at 22:57.

At approximately 4:44 p.m., Brewster received an incoming call, which call records show came from Hunt's -9326 Number.  During the call, Brewster says, "I'm right outside the Dunks," and later asks, "What color?"  Kenny Aff. ¶ 31.  After hanging up, he asked the CW for the "bread," or money.  The CW handed Brewster $1,500.  Brewster then received another incoming call, which call detail records show was also from the Hunt -9326 Number.[3]  During the call, Brewster states that he is sitting at the Dunkin' Donuts and will hop out right now.  Kenny Aff. ¶ 32.

Brewster exited the CW's vehicle.  He entered a white Chevrolet Malibu with North Carolina license plate HBM8786 in the area of the Dunkin' Donuts parking lot.  The vehicle is registered to PV Holding Corporation, the parent company of Avis Budget Group.  By no later than March 5, 2020, Special Agent Kenny received information from Avis Budget Group that the

---

[3] Toll records indicate that there were 7 calls between Hunt and Brewster between 4 and 5pm on March 2.  Of particular note, toll records indicate that Brewster's phone called Hunt's phone at 4:38, and Hunt's phone called Brewster's phone at 4:43, 4:44, and 4:45. *See* USAO 1546-47; USAO 0324-325.

Malibu had been rented on February 26, 2020 by Hunt, who provided the rental company with Hunt's -9326 number in connection with that rental.  Affidavit of Special Agent Timothy R. Kenny dated June 11, 2021, filed herewith ("2021 Kenny Aff.") ¶ 3.  The vehicle was returned on March 21, 2020.  Kenny Aff. ¶ 33.

Law enforcement surveilled the Malibu driving around the block, ultimately returning to the area of the Dunkin' Donuts parking lot.  The Chevrolet Malibu stopped near the parking lot and Brewster exited the vehicle.  Brewster walked back to the CW's vehicle and entered the front passenger seat.  Brewster handed CW a clear plastic bag containing a substance that later tested positive for crack cocaine.  *Id*. ¶ 34; USAO 0102 (certificate of analysis).   Brewster then exited CW-1's vehicle.

Agents conducted surveillance at Hunt's home on March 3 and 4 and saw the Malibu parked outside his house. 2021 Kenny Aff. ¶ 4.  Agents knew that both Brewster and Hunt were considered active members of the Franklin Hill street gang by the Boston Police Department. Kenny Aff. ¶ 9.

**C.  Request for and Review of Hunt's GPS Coordinates**

Prior to May 8, 2020, Special Agent Kenny learned that Hunt was on a GPS bracelet as a condition of pretrial release in Suffolk Superior Court.  2021 Kenny Aff. ¶ 7.  On May 8, 2020 – after receiving the information from Avis and the Brewster phone records discussed above —  he requested from the Massachusetts Probation Service's Electronic Monitoring Program ("ELMO") the GPS monitoring points for Timmy Hunt for the date of February 26, 2020 between 3:00pm and 4:30pm, and for the date of March 2, 2020 between 4:00pm and 5:30pm. 2021 Kenny Aff. ¶ 8.  On May 9, he received two maps depicting Hunt's location at those times.

5

*Id.*  Later on May 9, after receiving the first two maps, S/A Kenny emailed the ELMO program

again, requesting the GPS monitoring points for a narrower window of time: February 26, 2020

between 3:40pm and 4:00pm, and March 2, 2020 between 4:40pm and 5:00pm.  *Id.* ¶ 9.  He

received two maps responsive to that request.  *Id.*

      S/A Kenny reviewed Hunt's GPS locations at the time of the February 26 controlled

purchase.  The GPS locations show that Hunt traveled to the parking lot adjacent to 82 Talbot

Avenue at the time of the February 26 controlled purchase.  Kenny Aff. ¶ 26.

      S/A Kenny also reviewed Hunt's GPS locations at the time of the March 2 controlled

purchase.  The GPS locations show that Hunt traveled to the Dunkin' Donuts parking lot at the

time of the controlled purchase, and demonstrate that Hunt traveled around the block – on Fuller

Street, onto Washington Street, and down Bailey Street, the same path that law enforcement

surveilled the Malibu taking – during the controlled purchase.  Kenny Aff. ¶ 38.

### D.  Hunt's Consent to a GPS Condition of Release in His Suffolk Superior Court Case

      Hunt was arraigned on case number 1984CR00085 in Suffolk Superior Court on March

14, 2019.  He was present for the arraignment.  In requesting bail in the amount of $40,000 (the

amount originally imposed by the District Court, but which had been reduced to $15,000 over

time), the Assistant District Attorney argued that this was the fourth time Hunt had been caught

with a gun and that he was facing 10-15 years on the charges as well as 10-15 years as an Armed

Career Criminal.   Recording of March 14, 2019 Hearing, USAO 1644, at 2:41pm.  He also

noted Hunt's extensive criminal record and history of defaults.  *Id.* at 2:42pm.  The defense

attorney argued that Hunt had been in custody since his arrest approximately five months before,

that he was not a flight risk, that his family and friends could only afford $7,500-$11,000 bail

and requested $10,000 cash bail.  He added, "You want to put him on a GPS as well as some

kind of monitoring, he has no problem with that."  *Id.* at 2:49pm.  Thereafter the Commonwealth

requested GPS and home confinement if the defendant were to make bail.  The court set bail at

$15,000 and ordered GPS and home confinement if he made bail, but stated that if Hunt got a job

he would change the confinement.

Hunt remained in custody until he made bail on July 1, 2019.  There was no hearing that

date, but rather Hunt signed the Order of Pretrial Conditions of Release ("Pretrial Order") and

Order of GPS Supervision Conditions ("GPS Order") that date with the Probation Officer as his

witness.  Dkt. 87-1 at 2.  By signing the Pretrial Order, Hunt acknowledged that he was required

to obey all local, state, and federal laws; comply with electronic monitoring; and be on home

confinement. By signing the GPS Order, Hunt acknowledged, "I have read and understand the

above conditions of GPS supervision and I agree to observe them."  The order included the

following language:

> You are hereby placed on GPS by this Court. . . . Coordinates and other data
> related to your physical location while on GPS are recorded and may be shared
> with the court, probation, parole, attorneys and law enforcement.  Data generated
> by GPS equipment assigned to you is not private and confidential.

Hunt signed, and a Probation Officer signed as a witness.  Dkt. 87-1 at 3.

Thereafter, Hunt's conditions of release were addressed at several hearings.  At a hearing

on August 20, 2019, Hunt was present without his counsel.  Hunt addressed the court on his own

behalf, requesting a modification to his curfew days and hours.  He told the court, "Me being on

a bracelet is not an issue."[4]  Recording of August 20, 2019 Hearing, USAO 1646, at 12:42:39pm.

In response, the court allowed his requested change to an 11pm-7am curfew from Monday

through Saturday.

On October 4, 2019, Hunt, through counsel, requested another modification to curfew to

allow him to work some overnight shifts.  His counsel argued, "He's on a GPS anyway. . . . This

is an opportunity for him to be more productive and he's asking the court to please allow him to

work these hours." Recording of October 4, 2019 Hearing, USAO 1647, at 12:42pm.  Later in

the hearing, defense counsel stated, "Anybody that wants to know where he is, look at his GPS

points.  He's trying to make a living."  *Id.* at 12:47:20pm.  The court ultimately allowed the

request, but required Hunt to provide verification of hours.

## ARGUMENT

### I.  Legal Standard

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const.

amend. IV.  The Supreme Court has held that a "search" does not require a physical intrusion,

but that a government violation of an individual's reasonable expectation of privacy can also

constitute a "search" for Fourth Amendment purposes.  *Smith v. Maryland,* 442 U.S. 735, 739-

740 (1979).  The Supreme Court in *Smith* established a two-part test to determine when an

---

[4] Although it is not clear whether he meant that he had no objection to being on GPS or that he had not had any
violations while he was on GPS, what is clear is that neither in this hearing nor in any of the others that the
government accessed did Hunt or his counsel object to the use of GPS tracking; in fact, they consistently relied on
the fact that he was on GPS to argue for less stringent curfews and other conditions.

8

individual has a reasonable expectation of privacy: (1) the individual must have a subjective

expectation of privacy, and (2) that expectation must be one that "society is prepared to

recognize as reasonable." *Id*. (quoting *Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan,

J., concurring)); *see also United States v. Rheault,* 561 F. 3d 55 (1st Cir. 2009).

The "touchstone of [courts'] analysis under the Fourth Amendment is always 'the

reasonableness in all the circumstances of the particular governmental invasion.'" *Pennsylvania

v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

"Before reaching the merits of a suppression challenge, the defendant carries the burden

of establishing that he had a reasonable expectation of privacy with respect to the area searched

or . . . the items seized."  *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008) (citing

*United States v. Salvucci*, 448 U.S. 83, 91-92 (1980)).

## II.     Attaching a GPS Bracelet to a Pretrial Defendant As a Condition Of Release Does Not Violate the Fourth Amendment

Hunt argues for a sweeping – and federally unprecedented – holding that attaching a GPS

bracelet to a pretrial defendant as a condition of release *ipso facto* violates the Fourth

Amendment.  However, he does not cite to a single federal case so holding, nor has the

government been able to identify one.  And indeed, GPS monitoring is routinely ordered as a

condition of release that can help to ensure a defendant's appearance in court without having to

detain the defendant, pursuant to 18 U.S.C. § 3142(c)(1)(B)(xiv).

Assuming *arguendo* that attaching a GPS bracelet to a pretrial defendant as a condition of release constitutes a search,[5] here it was constitutional because (1) Hunt consented to – and in fact requested – the imposition of the GPS bracelet to obtain other favorable conditions of release and (2) the attachment of the GPS bracelet did not violate any expectation of privacy that Hunt subjectively had and that society is prepared to find reasonable.

A.  **Hunt Had No Reasonable Expectation of Privacy Because He Consented to the Imposition of a GPS Bracelet and Both ELMO's and Law Enforcement's Access to the Data It Collected**

Hunt cannot succeed on his Fourth Amendment challenge because he not only consented to, but in fact affirmatively asked to be placed on GPS and repeatedly affirmed his consent to remain on GPS in order to obtain other favorable conditions of release.

A search conducted pursuant to valid consent is constitutionally permissible even in absence of a warrant or probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent was freely and voluntarily given is determined based on the totality of circumstances. *Id.* at 227.   *See also United States v. Twomey*, 884 F.2d 46 (1st Cir. 1989). Here, the totality of the circumstances demonstrate that consent was freely given.

---

[5]  The government acknowledges the Supreme Court's holding in *Grady v. North Carolina,* 575 U.S. 306, 309 (2015) that a Fourth Amendment search occurs when the government "attaches a device to a person's body *without consent*, for the purpose of tracking that individual's movements." (Emphasis added.)  That holding does not apply here because, as demonstrated below, Hunt did consent and in fact affirmatively asked for GPS tracking in lieu of high bail.  *Commonwealth v. Norman*, 484 Mass. 330 (2020), relied upon by the defendant, holds only that the attachment of a GPS tracking device as a condition of pretrial release violates Article XIV of the Massachusetts Declaration of Rights, which is more protective than the Fourth Amendment.  *See e.g., Commonwealth v. Feliz,* 34 Mass. L. Rep. 201 (2017) ("in Massachusetts, 'art. 14 offers greater protections for parolees than does the Fourth Amendment'") (citations and quotations omitted); *Commonwealth v. Upton*, 394 Mass. 363, 373 (1985) ("art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause" to obtain a search warrant).

As set forth above, at his arraignment on the indictment in Suffolk Superior Court, Hunt's counsel argued for a $10,000 bail instead of the $40,000 requested by the Commonwealth. In support of his argument, he said, "You want to put him on a GPS as well as some kind of monitoring, he has no problem with that." Recording of March 14, 2019 Hearing, USAO 1644, at 2:49pm. In response, the court set bail at $15,000 and ordered GPS and home confinement if he made bail.

On July 1, Hunt posted bail and signed the Pretrial Order and GPS Order, acknowledging that data about his physical location would be recorded "and may be shared with the court, probation, parole, attorneys and law enforcement"; it specifically noted that this data "is not private and confidential." Although Hunt claims that he "did not read all the fine print," Hunt Aff. ¶ 3 (Dkt. 87), he does not allege that he did not understand how the GPS would keep a log of his coordinates and who would have access to it. He tacitly acknowledges that he signed because he "wanted to be released to home detention." *Id.* ¶ 3.

Repeatedly thereafter, Hunt – one time alone and other times through counsel – asked the court to ease his curfew, each time arguing that the GPS requirement would mitigate any risk.

Under very similar circumstances, the court in *United States v. Clay* held that a defendant "voluntarily consented to GPS monitoring in order to obtain the benefit of pretrial release" and accordingly pretrial services could disclose his GPS data to law enforcement without a warrant. No. 4:12-CR-735-03, 2013 WL 4483405 (S.D. Tex. May 6, 2013). Although the defendant argues this is not valid consent because the alternative was imprisonment, in many cases in which the defendant consents to a search and the court affirms that consent was valid, the defendant consented because he was in a difficult position and made the strategic decision that

11

consent will produce a better outcome for him than refusing consent.  Hunt, *while represented by counsel*, made the strategic decision to request GPS in order to get out of jail sooner and obtain a more lenient curfew.[6]  This is valid consent.

### B.  Pre-Trial Releasees Have a Diminished Reasonable Expectation of Privacy, and the Imposition of GPS Tracking Was Reasonably Related to Legitimate Pre-Trial Release Goals

Even if Hunt had not consented, the imposition of GPS tracking here would not violate the Fourth Amendment because pretrial releasees have a diminished expectation of privacy, and reasonable conditions can be imposed on their release that invade their privacy if they are reasonably related to the goals of pretrial release.

Although it is widely recognized that probationers and parolees have a drastically reduced expectation of privacy, some courts have also held that a criminal defendant on pretrial release has a diminished expectation of privacy vis-à-vis someone who has not been charged with a crime.  *See Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695 (6th Cir. 2011) (requirement that defendant participating in pretrial release program undergo drug testing "undoubtedly was highly intrusive, [the defendant] had a significantly reduced expectation of privacy because he was on pre-trial release awaiting criminal prosecution and, as a condition of such release, had agreed that he would undergo drug testing); *but see United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) (holding that drug testing of pretrial releasee without probable cause

---

[6]  In this regard, Hunt's consent here is markedly different than the consent in the cases discussed by the defendant. *See* Motion at 9.  This is not a case where the defendant, alone with law enforcement in a fraught situation, acquiesced. With the benefit of counsel and time to think about what he wanted to do, he chose to request release on GPS.

violated the Fourth Amendment).  A pretrial releasee has a diminished reasonable expectation of privacy because there has been a judicial or grand jury finding of probable cause that the individual committed a crime, and the person is now subject to the possibility of detention or release on conditions in order to assure his appearance in court and the safety of the community.

As the dissent in *Scott* persuasively argues, given that a pretrial defendant can be held in custody to assure his appearance in court, and subjected to the same deprivations of privacy that a post-conviction prisoner bears, *see Bell v. Wolfish*, 441 U.S. 520, 534 (1979), it stands to reason that he can also be released on conditions that limit his freedom or his privacy more than an uncharged individual, all without running afoul of the Fourth Amendment, so long as those conditions are reasonable. 450 F.3d at 878 (Bybee, J., dissenting).  Thus, the same framework that applies to probationers, laid out in *United States v. Knights,* 534 U.S. 112 (2001), should apply here.  The question therefore is whether under the "totality of the circumstances," *Ohio v. Robinette,* 519 U.S. 33, 39 (1996), the search is reasonable, balancing the degree to which it intrudes upon an individual's privacy and the degree to which it is needed for the promotion of legitimate governmental interests.  *Knights*, 534 U.S. at 119.

Here, the government has an interest in ensuring criminal defendants' appearance in court and protecting the community from future crimes if they are released.  Attaching a GPS tracker is directly related to both goals because – as the Massachusetts Supreme Judicial Court has found – it both deters and detects violations of conditions of release, including flight and the commission of new crimes.  *Commonwealth v. Johnson*, 119 N.E.3d 669, 680 (Mass. 2019), *cert denied*, 140 S.Ct. 247 (2019) (affirming that accessing a probationer's historical GPS data without a warrant did not violate the Fourth Amendment or the more protective Article XIV).

13

Although the SJC said in *Commonwealth v. Norman,* 142 N.E. 3d 1, 8 (2020), that the only legitimate interest of the Massachusetts bail statute was ensuring a defendant's appearance in court, even if that is true, use of a GPS bracelet relates directly to that goal by allowing Probation and/or law enforcement to determine where a criminal defendant is if he does not appear in court and enabling them to bring him to court.  Here, the Commonwealth detailed the defendant's history of defaults as well as the significant prison term he faced in arguing that Hunt posed a risk of flight, and the Commonwealth also asked for GPS to be imposed as a condition of release for that reason.

It bears mention that here, the GPS bracelet in fact permitted Probation to learn that Hunt had violated the terms of his release – namely, he had committed a new federal and state offense by virtue of his drug activity with Brewster.  Upon learning that information by virtue of the federal indictment, on June 24, 2020, Probation requested and obtained a Probation Warrant, and on July 23, 2020, his state bail was ordered revoked, although at that point he was in federal custody.  *See Commonwealth v. Hunt*, 1984CR00085 Docket, Dkt. No. 86-1, at 12-13.

Accordingly, the imposition of GPS tracking was reasonably related to a legitimate government interest and did not violate Hunt's diminished reasonable expectation of privacy as a pretrial defendant on release.

### III.   Accessing Three Hours' Worth of GPS Data Is Not a Search, Nor Does It Violate the Fourth Amendment

#### A. Accessing Three Hours' Worth of Targeted GPS Data Is Not a Search

Furthermore, agents' accessing three hours' worth of GPS data – 1.5 hours each on the two dates of controlled purchases, around the time of the controlled purchases – is not a search

14

for Fourth Amendment purposes.  In *Carpenter v. United States,* 138 S. Ct. 2206 (2018), the

Supreme Court emphasized that its holding was "a narrow one."  In  addressing the parties'

arguments about for what length of time cell site location information may be acquired before it

becomes a search, the Court noted that the defendant had argued for a 24-hour cutoff and the

United States had suggested a 7-day cutoff.  The Court stated:

> we need not decide whether there is a limited period for which the Government
> may obtain an individual's historical CSLI free from Fourth Amendment scrutiny,
> and if so, how long that period might be. It is sufficient for our purposes today to
> hold that accessing seven days of CSLI constitutes a Fourth Amendment search.

*Id.* at 2217 n. 3.  Thus, defendant's reliance on *Carpenter* to argue that the accessing of GPS data

in this case was a search is misplaced.  The Court in *Carpenter* and *Jones* was concerned about

giving the government unfettered access to weeks or months' worth of information about an

individual's every coming and going and association; it found that individuals have a

"reasonable expectation of privacy in the whole of their physical movements."  *Carpenter,* 138

S. Ct. at 2217 (citing *United States v. Jones,* 565 U.S. 400, 430 (2012)).  That concern is not

implicated with a targeted request such as Special Agent Kenny made here.  He requested only

1.5 hours' worth of GPS data for only two dates – dates and times at which he already had

probable cause to believe that Hunt had been present at and participating in a drug transaction

with Brewster.  This type of precise, targeted request does not rise to the level of a Fourth

Amendment search.  Indeed, even the Supreme Judicial Court in *Johnson* stated that reviewing a

probationer's historical GPS data to determine whether he was present at the times and locations

where unsolved break-ins may have occurred "is not a search in the constitutional sense."

*Johnson,* 119 N.E. 3d at 685.  It stated, "So long as the review is targeted at identifying the

15

defendant's presence at the time and location of particular criminal activity during the probationary period, it is not a search, as such review is consistent with a probationer's limited expectations of privacy." *Id.*at 686.

### B.  Hunt Did Not Have a Reasonable Expectation of Privacy in the GPS Data He Knew Was Being Collected By a Third Party and Made Available to Others

Even if accessing three hours' worth of historical GPS data were considered a search under the Fourth Amendment, it must be considered a reasonable and therefore constitutional search, particularly given Hunt's lack of any reasonable expectation of privacy in the GPS data. *See Grady,* 575 U.S. at310 ("The Fourth Amendment prevents only *unreasonable* searches.  The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.").

Hunt did not have an expectation of privacy in the GPS data that society is prepared to recognize as reasonable.  He had been specifically warned in the forms that he signed on July 1, 2019, that the GPS data collected by the device "may be shared with the court, probation, parole, attorneys and law enforcement" and "is not private and confidential."  His attorney had argued, in his presence, "*Anybody that wants to know where he is*, look at his GPS points.  He's trying to make a living."  Recording of October 4, 2019 Hearing, USAO 1647, at 12:47:20pm (emphasis added).  The collection of his location information was not happening silently in the background of his phone as in *Carpenter,* nor unbeknownst to him on his car as in *Jones*; it was happening via an ankle bracelet that was constantly in his view, required to be charged, etc.  *See United States v. Lambus,* 897 F.3d 368, 412 (2d Cir. 2018) (defendant, "as a parolee who chose to be

16

placed on GPS monitoring rather than be charged with parole violations and possibly returned to

prison, and who acknowledged that the monitoring would occur 24 hours a day, seven days a

week, until the end of his period of supervision, had no reasonable or legitimate expectation of

privacy that was violated by such monitoring"). By going to a particular location while wearing

the monitor, he assumed the risk that this information he was making available to Probation, law

enforcement, and others, would in fact be reviewed by them.[7] He did not have a reasonable

expectation of privacy in the GPS data.

### C. Law Enforcement's Access of the GPS Data Was Reasonable In Scope, Related to the Purposes that Monitoring Was Imposed, and Supported By Probable Cause, and Thus Did Not Violate the Fourth Amendment

The request here was reasonable in scope: 1.5 hours on each of two specific days. It was

not a "fishing expedition," but instead was supported by probable cause that it would turn up

evidence of a crime. As such, law enforcement's accessing this data was rationally related to one

of the reasons that GPS was imposed – to detect evidence of a state/federal law violation, which

is also a violation of conditions of release – and was reasonable under the Fourth Amendment.

*See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) ("when faced with special law enforcement

needs, diminished expectations of privacy, minimal intrusions, or the like . . . circumstances may

render a warrantless search reasonable"); *Griffin v. Wisconsin,* 483 U.S. 868 (1987) (upholding a

---

[7] *See Mackey v. Hanson*, No. 19-cv-01062-PAB, 2019 WL 5894306 (D. Co. Nov. 12, 2019) (rejecting habeas claim of defendant who had unsuccessfully moved to suppress GPS data from the GPS bracelet he had worn as a condition of state pretrial release, because the defendant had a full and fair opportunity to litigate his Fourth Amendment claim in the state court proceedings, and the state court had acted consistently with Supreme Court precedent; the state court had concluded that he did not have a reasonable expectation of privacy in information voluntarily turned over to third parties).

"special needs" search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions); *Knights,* 534 U.S. at 121-122 (holding that the warrantless search of a probationer, supported by reasonable suspicion and authorized by a probation condition, satisfied the Fourth Amendment); *United States v. Mathews,* 928 F.3d 968, 974 (10th Cir. 2019) (warrantless review of parolee's historical GPS data placing him in the vicinity of a series of robberies, even if it was a search within the meaning of the Fourth Amendment, was permissible under the totality of the circumstances).

The fact that Special Agent Kenny had probable cause to believe that Hunt – while on pretrial release – had committed the drug offenses with Brewster, and to believe that the GPS coordinates would provide further evidence of those crimes and violations of release, is fatal to the claim of a Fourth Amendment violation. At the time that he sought the GPS data, S/A Kenny knew that Brewster and Hunt were both considered active members of the Franklin Hill gang by the Boston Police Department; was aware of the contacts between Brewster's and Hunt's phones around the times of the controlled purchases on February 26 and March 2; had heard the portions of those conversations that are audible in the videos of the controlled purchases further leading him to believe that Hunt was supplying Brewster; had seen the surveillance video depicting the Malibu driving up at the time of the controlled purchases; had the information provided by Avis that Hunt had rented the Malibu; and was aware of the surveillance of the Malibu outside Hunt's home on March 3 and March 4. Accordingly, at the time of the GPS request on May 8, 2020, there was probable cause that Timmy Hunt was supplying Brewster with drugs from inside the Malibu during the times of the controlled purchases and that the GPS data would provide further

evidence of those crimes. Under these circumstances, the precise, targeted request he made for GPS data for those two dates and times was reasonable under the Fourth Amendment.

### IV.    Even If There Were a Fourth Amendment Violation, the Exclusionary Rule Should Not Apply Because Agents Acted in Good Faith

Even if obtaining the three hours' worth of GPS data without a warrant violated the Fourth Amendment, the exclusionary rule should not apply because law enforcement acted in good faith; there is no police misconduct to deter here.  "The fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 141 (2009) (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).  The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones.  *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (holding that the good-faith exception extends to "objective reliance on binding judicial precedent").  The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).  It is a "last resort, not our first impulse." *Herring*, 555 U.S. at 141 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Because suppression imposes a "costly toll upon truth seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a court must find that "the benefits of deterrence . . . outweigh the costs" before excluding evidence obtained in violation of the Fourth Amendment.  *Id.* (quotation marks omitted); *Davis*, 131 S. Ct. at 2427 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy

costs. . . . Our cases hold that society must swallow this bitter pill when necessary, but only as a

'last resort.'").

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that

exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the

price paid by the justice system." *Herring*, 555 U.S. at 144.  Suppression may therefore be

warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances

recurring or systemic negligence." *Id.*; *Davis*, 131 S. Ct. at 2427.  "But when the police act with

an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct

involves only simple, isolated negligence, the deterrence rationale loses much of its force, and

exclusion cannot pay its way." *Davis*, 131 S. Ct. at 2427-2428 (internal citations and quotation

marks omitted).

Here, agents acted in an objectively reasonable manner, relying on the absence of any

federal law holding that a warrant must be obtained in order to obtain three hours' worth of

pinpointed GPS data from a pretrial defendant's GPS bracelet, where there is probable cause that

such data constitutes evidence of a crime.  Indeed, the defendant is arguing for a sea change in

the law.  Agents can not be faulted for not predicting such a change and acting in accordance

with their reasonably-held good-faith belief that their conduct was lawful.  *See United States v.

Rose,* 914 F. Supp. 2d 15, 24 (D. Mass. 2012) (declining to suppress car GPS tracking data that

law enforcement obtained pre-*Jones* because at the time of installation they had a good-faith

basis to believe that the installation and monitoring of such a device was not a Fourth

Amendment search); *United States v. Ramirez,* 471 F. Supp. 3d 354 (holding that application of

the exclusionary rule would not be appropriate where law enforcement pre-*Carpenter* relied on

20

18 U.S.C. § 2703(d) to obtain historical cell site information and there was no binding precedent from the First Circuit at the time suggesting it was unconstitutional).

Because an objectively reasonable officer would not have known that the Fourth Amendment required a warrant to obtain the GPS evidence in this case, exclusion of the evidence is not appropriate.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Suppress should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA,
By its attorney,

NATHANIEL R. MENDELL
Acting United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

Dated: June 11, 2021

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney

Dated: June 11, 2021

21